CHARLES P. WELD *versus* HUMPHREY N. LANCASTER.

A written promise to pay a specific sum to, and save harmless, from the post-office department, a mail contractor, in consideration that he will repudiate his accepted proposal for carrying the mail on a specified route, is illegal.

Such a promise cannot be enforced, although the government had a sufficient guaranty and was not pecuniarily injured by such repudiation.

ON REPORT.

ASSUMPSIT upon a written contract, dated July 18, 1853. The writ was dated Dec. 17, 1860, and contained a special count upon the contract, and also a count for $1000, for money laid out and expended at defendant's request.

It appeared on the part of the plaintiff, that, in accordance with an advertisement from the post-office department of the U. S., he, in March, 1853, made a written proposal to carry the U. S. mail on route No. 74, from July, 1853, to July, 1857, for the annual sum of $895 ; that Henry Morrill and William Arnold became his sureties that the plaintiff would enter into a contract, prior to July 1, 1853, to perform the service proposed, provided said proposal should be accepted by the department; that the postmaster general, on the 25th of the following April, accepted the plaintiff's proposal, and duly notified him of such acceptance; that the plaintiff declined to enter into the contract proposed, and that thereupon the post-office department contracted with the defendant to carry the mail on route 74, at a higher annual rate.

The contract declared on was signed by both parties and was of the following tenor ; — "I, H. N. Lancaster, agree to stand between the post-office department and to hold harmless Charles P. Weld, in the contract for carrying the U. S. mail, as per the proposals advertised by the department, on route No. 74, the department having accepted said Weld's bid. The said Weld agrees and has informed the department that he cannot fulfil this contract, and furthermore agrees that he will not perform the contract with the depart-

ment. Said H. M. Lancaster hereby agrees to pay C. P. Weld $100 for so doing, and to hold him harmless from all claims of the post-office department."

The plaintiff put in an assignment of the above contract from himself to Henry Morrill, and copy of a judgment of the U. S. against him and his sureties, Morrill and Arnold, for $419,99 debt, and costs taxed at $24,51, recovered in 1856, and founded upon their proposal to carry the mail and refusal to enter into the contract, as agreed in the proposal, after its acceptance. It also appeared that the surety Arnold paid the execution issued on the judgment, and that the defendant frequently promised to pay and adjust the same.

The case was taken from the jury and reported to the full Court, which was to render judgment by nonsuit or default.

*N. G. Jewett*, for the plaintiff.

*W. G. Crosby*, for the defendant.

DANFORTH, J. — The only question involved in this case is whether the contract declared upon is a valid one. It is very evident that its true construction is quite different from that put upon it by the plaintiff's counsel in his argument. The defendant neither does, nor agrees to assume the plaintiff's obligation to the government, whatever that may be, but promises to pay him a certain sum of money, " and to hold him harmless from all claims of the post-office department," in consideration that he " has notified the department that he cannot fulfil his contract," and further, " that he will not perform it." The plaintiff, after notice given by the postmaster general, had made proposals for carrying the mail upon a certain route. These proposals had been accepted, and thereupon he became under obligation to enter into a contract and furnish security for carrying the mail as proposed. The repudiation of this obligation is the only consideration, if there is any, upon which the defendant's agreement rests. Can a promise, resting upon such a foun-

dation, be legally binding? It is clear, both upon principle and authority, that all contracts in violation of law, or contrary to public policy, are void; but it is not so clear in all cases as to whether a specified contract comes within this rule. And, upon this question, there may be an apparent, though, we think, no real conflict in the decisions.

In *Bellows* v. *Russell*, 20 N. H., 427, it is held that an agreement between several persons, that one shall, in behalf of all, bid for a mail contract, is not void " unless made for an illegal purpose affecting public policy ;" and to prevent a fair competition is held to be an illegal purpose. The same principle is affirmed in *Huntington* v. *Bardwell*, 46 N. H., 492. So in *Phippen* v. *Stickney*, 3 Met., 384, after a full and able review of the authorities, the same doctrine is adopted. Though in these cases the contract in question is held valid, it is distinctly put upon the ground that no inference could be drawn, either from the contract itself, or from the facts developed, inconsistent with the honesty and pure motives of the parties, but on the other hand both the contract and the facts in each case tended to show that the parties were acting in good faith, and that their acts were consistent with and in furtherance of the object of the sale. All these cases clearly recognize the principle that where the agreement is made for the purpose of preventing a fair competition at public sales, or for the purpose of giving an undue advantage to either party, such a contract is contrary to public policy and void. It will be noticed that the object of the contract involved in these cases was, not to impose an absolute restraint upon one of the parties in relation to bidding, but rather that one should bid for all, thereby making all interested in the purchase, thus tending to secure a fair value for the property sold, rather than to prevent a fair competition in the sale, especially when the amount involved is so large as to be beyond the ability of any one of the parties.

In *Walker* v. *Richardson*, 10 M. & W., 284, a bond given to a trustee, to indemnify him for making a disposition

of the trust property different from that contemplated in the will making the appointment, was held valid, on the ground that the facts not only failed to show that the trustee had in any respect been blameworthy, but were consistent with his fidelity in the execution of his trust. In this case, too, the principle is clearly recognized that, 'if there had appeared to have been any attempt on the part of the trustee to have wronged third parties, the result would have been otherwise.

There is, however, another class of cases, where contracts apparently similar, have been declared illegal and void. *Gardiner* v. *Morse*, 25 Maine, 140; *Gulick* v. *Wood*, 5 Halst., 87; *Smith* v. *Wilcox*, 35 Barbour, 293.

The same principle is laid down by Story in his Commentaries upon Equity Jurisprudence, vol. 1, § 293. Many other authorities to the same effect might be cited, but these are sufficient.

These cases differ from the others cited, in the single fact, that here the contract in question imposed an absolute obligation upon one of the parties to refrain from bidding, with no provision that he was to be interested in the purchase; simply that he would not be a competitor of the party promising, thereby preventing a fair competition to that extent. This, of itself, is held sufficient to authorize a judicial declaration of the illegality of the contract, upon principles which are recognized as sound in all the cases.

The facts developed in the case at bar would seem very clearly to bring it within these principles. It is true, that, in this case, the bid had been made and accepted, thereby resulting in a contract. But the repudiation of that contract was virtually withdrawing the bid or proposals, as in *Smith* v. *Wilcox* above cited. It had not only a tendency to prevent competition, but was entirely destructive of it. The time for sending in proposals had elapsed, and government was obliged to make the contract without the benefit of an auction sale, as contemplated by law. If the plaintiff had in the first instance refrained from bidding in obedience

to an agreement for that purpose, his conduct would have been certainly no more destructive to the interests of the government; and such a contract all the authorities hold invalid.

The contract in question, upon its face shows an attempted fraud upon the government, and is in violation of the policy of the post-office law. The only possible inducement the defendant could have had for his promise, was the hope and expectation that the plaintiff's repudiation might enable him to obtain greater pay for carrying the mail than had been fixed under the proposals made in accordance with law; that he could deprive the government of the benefit of the contract to which it was fairly entitled; otherwise he would have taken an assignment of the plaintiff's right, and carried the mail according to his proposals. The plaintiff must have had a full knowledge of the defendant's object and motives,— and the contract itself shows clearly a willingness on his part, for a consideration, to lend his aid in the attempted fraud. His assertion to the government that he could not perform the service for the price proposed, was hardly consistent with the bonus he was to receive for his repudiation. It is evident that the parties understood each other. In their confederacy they were aiming at the same result, that of compelling the government to pay a higher price for the service than the original proposal of the plaintiff contemplated; and this result their combination accomplished. If this contract is sustained one of the parties, at least, will reap the intended reward of his wrong. It is true the government has paid the increased price resulting from this combination and if this action is not sustained the defendant, in violation of his agreement, receives the benefit of it. The old adage that "there is honor among thieves" has no place in the law, and if the plaintiff has trusted to the honor of the defendant, to that he must look for redress and not appeal to the law, for, upon legal ground, both stand alike.

It does not alter the case that the government had a suf-

ficient guarrantee and was not pecuniarily injured. The end accomplished is not the test by which we are to judge of the validity of the contract, but rather the end aimed at by the parties. That this end was a violation of the spirit of the law, which provides that mail contracts shall be open to fair competition and awarded to the lowest bidder, and that no contract for the transportation of the mail shall knowingly be made with any person who shall have entered into combination * * * to prevent the making of any bid for a mail contract by any other person," would seem to be too clear to admit of a doubt, that it was the result of a combination between the parties, to get more than a fair compensation for the service to be performed, or at least, to deprive the government of the benefit of a contract to which it was justly entitled, is quite as evident. By all the authorities as well as upon sound principle such a contract cannot be sustained.        *Plaintiff nonsuit.*

APPLETON, C. J., CUTTING, WALTON, DICKERSON and BARROWS, JJ., concurred.